**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

_____

UNITED STATES OF AMERICA,                    )
                                             )
                                             )
        v.                                   )          **Criminal No. 3:08CR189**
                                             )
CHRISTOPHER DANCY, <u>et</u> <u>al.</u>,     )
                                             )
        **Defendants.**                      )
_____)

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on the United States' non-dispositive motion to disqualify

defense counsel ("U.S. Mot. to Disqualify") (docket entry no. 12), that has been referred to this

court by the trial court for resolution pursuant to 28 U.S.C. § 636(b)(1)(A) (Order, May 9, 2008)

(docket entry no. 14).  The motion has been fully briefed and argued, and is therefore ready for

disposition.

### I.  Facts and Procedural History

This case concerns the prosecution of members of an illegal drug trafficking operation in

which Defendants Christopher Dancy (Dancy) and Glynnis Gordon (Gordon) were allegedly

involved.  (U.S. Mot. to Disqualify at 2-3.)  An investigation into the operation by local and

federal law enforcement revealed a conspiracy involving multiple targets and the ongoing

investigation has resulted in a number of prosecutions over time.  (<u>Id.</u> at 2-3.)  On March 25,

2008, law enforcement officers executed federal search warrants at an apartment allegedly used

as a so-called "stash house" by Defendant Dancy, and the separate residence of Dancy and his

girlfriend, Defendant Gordon.  (<u>Id.</u> at 4.)  Incriminating evidence was seized as a result of the

searches, and on April 21, 2008, Defendants Dancy and Gordon were each indicted on one count

of conspiracy to distribute cocaine hydrochloride, and one count of possession of cocaine with the intent to distribute.  See docket entry no. 8.  On May 20, 2008, the United States obtained a superceding indictment charging the Defendants with the additional offenses of possession of cocaine with the intent to distribute, possession of a firearm by an unlawful user of controlled substances, and possession of marijuana.  See docket entry no. 17.

At a detention hearing on March 31, 2008, counsel for the United States advised the Court that there were potential conflicts of interest regarding Arnold Henderson, Esquire (Henderson) who appeared on a retained basis to represent Gordon, and Shannon Taylor, Esquire (Taylor) who had been retained to represent Dancy.  (U.S. Mot. to Disqualify at 5.)  Government counsel represented that the case was related to a larger "hub and spoke" series of pending drug conspiracy cases.  (Id. at 4.)  Government counsel further represented that a defendant in a related case, who was expected to testify in Gordon's anticipated trial, was also a former client of Henderson's and is actively cooperating as a government witness in order to seek a reduction in the sentence he received as the result of his conviction for his involvement in the overall conspiracy.  (Id. at 5.)  The Court found that for the limited purpose of the detention hearing, a conflict did not exist and it permitted attorneys Henderson and Taylor to continue their representation of their respective clients for the time being.  See Defs.' Mot. to Reassign Indictment ("Defs.' Mot. to Reassign") at 3.)

Defense counsel subsequently moved the Court to reassign the case to a different trial court pursuant to the random assignment protocol of the District Court Clerk's Office whereby they asserted that the case was not sufficiently related to other cases that the trial court had presided over.  (Defs.' Mot. to Reassign at 1.)  In their motion, Defendants sought to compel the

United States to provide a reasonable explanation for why the present case was necessarily related to that of Henderson's former client.  (Id. at 5.)  In response, the United States asserted that the cases were necessarily related because of the nature of the overall conspiracy and the need for the Court to determine whether the former client of Henderson deserved a reduction in his sentence for his cooperation ("substantial assistance").  (Id. at 5.)  The United States also moved to disqualify both attorneys, and requested a hearing for them to show cause why they should not be disqualified from their continuing representation of their respective clients.  (U.S. Mot. to Disqualify at 1.)  The matter was then referred to this Court for resolution of the motion to disqualify.

The United States argues that Henderson's representation presents a basic conflict of interest because of his prior representation of a co-conspirator whom may be called to testify against Gordon, at least as to the overall conspiracy that the government asserts Gordon was a knowing participant, and whom Henderson would accordingly confront in cross-examination. (Id. at 12-16.)  With respect to Taylor, the United States argues that her representation of Dancy also presents a conflict because of her previous role as the assigned prosecutor to a local multi-jurisdictional grand jury that had also been investigating aspects of the overall conspiracy over time, and her "personal and substantial" involvement in the grand jury's activities.  (Id. at 16-19.)

On May 13, 2008, this Court held a hearing during which attorneys Henderson and Taylor testified as to why each believes the United States' motion to disqualify them should be denied.  Henderson testified that he questioned his former client about his current client, Gordon, and that his former client told him that he did not know Defendant Gordon.  Henderson

-3-

contended that his former client's lack of knowledge about Defendant Gordon precludes the possibility of a conflict of interest on his part.  Government counsel represented to the Court at the hearing that Henderson's former client would likely be called to testify on behalf of the United States in any trial of the pending case involving Gordon, and if not with direct evidence implicating Gordon, the witness would provide at least  evidence of the overall conspiracy of which she was allegedly a part. When asked by the Court whether a conflict would exist if his former client's position regarding his knowledge of Defendant Gordon was to change at trial, Henderson stated that a conflict would exist under those circumstances, and that he would then be compelled to discontinue his representation of Gordon at that juncture.

In regard to Taylor, government counsel represented to the Court that a former local police detective assigned to the local grand jury (former Detective Mark Dunn) (Dunn) told her that subpoenas related to the conspiracy had issued from Taylor's office and that the subpoenas were either signed by Taylor, or at least stamped with Taylor's signature by her secretary, presumably with Taylor's authorization.  At the conclusion of the hearing, the Court continued the proceedings in order to provide an opportunity for each party to interview Detective Dunn about any contact he had with Taylor related to the multi-jurisdictional grand jury's investigation of related matters.

The hearing resumed on June 25, 2008.  In the interim, the United States arranged for the attorney (Craig S. Cooley, Esquire), who had made a special appearance at the initial hearing on behalf of Henderson and Taylor, to interview Henderson's former client regarding his knowledge of the alleged conspiracy and the alleged involvement of Defendants Dancy and Gordon.  The United States also requested information from the local multi-jurisdictional grand jury to

determine the number of subpoenas requested by Detective Dunn and authorized by Taylor on behalf of the grand jury when she served as its Special Counsel.

The United States contends that Henderson's former client possesses information about the overall drug trafficking organization and the specific conspiracy that Dancy and Gordon are implicated in that would be critical to and necessary for the prosecution of Dancy and Gordon. Counsel for Henderson (Mr. Cooley) reported to the Court that, upon his interview of Henderson's former client, he did not, in fact, possess direct evidence against Gordon, and, therefore, no conflict exists as to his continuing representation of her.

In regard to Taylor, the United States proffered, without objection, that between 2005 and 2008, Detective Dunn requested, and Taylor authorized on behalf of the grand jury, the issuance of at least eighty-eight (88) subpoenas related to the overall drug conspiracy that allegedly involves Defendants Dancy and Gordon. Counsel for Taylor asserts, however, that Taylor's role in the issuance of the subpoenas was not "substantial" as required to constitute a conflict pursuant to the relevant ethical rule that would, in turn, preclude her continued representation of Dancy.

## II. Analysis

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. An essential aspect of that right is a defendant's right to select counsel of his choice. See Powell v. Alabama, 287 U.S. 45, 53 (1932); see also Wheat v. United States, 486 U.S. 153, 158 (1988). The right to select counsel of one's choice, however, is not absolute; rather, it must be balanced against the court's "independent interest in ensuring that criminal trials are conducted within the

ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, 486 U.S. at 160 (citations omitted) ("the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."); see also United States v. Howard, 115 F.3d 1151, 1155 (4th Cir. 1997); United States v. Williams, 81 F.3d 1321, 1324 (4th Cir. 1996); In re Asbestos Cases, 514 F. Supp. 914, 925 (E.D. Va. 1981). District courts "must recognize a presumption in favor of a defendant's counsel of choice," Wheat, 486 U.S. at 164, and should not interfere with the presumption "*unless the specific circumstances of a representation in a case demand the court's attention to the potential impropriety of that representation*." United States v. Franklin, 177 F. Supp. 2d 459, 463 (E.D. Va. 2001) (citing United States v. Collins, 920 F.2d 619, 625 (10th Cir. 1990)) (emphasis added).

Motions to disqualify a defendant's chosen counsel are assessed on a case-by-case basis, Franklin, 177 F. Supp. 2d at 464 (citing United States v. Tessier, 731 F. Supp. 724, 729 (E.D. Va. 1990)). Trial courts are afforded broad discretion in making disqualification determinations. Franklin, 177 F. Supp. 2d at 464 (citing Wheat, 486 U.S. at 161-64); see also United States v. Scott, 980 F. Supp. 165, 167-68 (E.D.Va. 1997). Exercise of this discretion, however, should be guided by the courts' recognition that disqualification is a "drastic step." See Shaffer v. Farm Fresh, Inc., 966 F.2d 142, 145-46 (4th Cir. 1992). Courts must be mindful of practical considerations implicated by disqualification, such as a defendant's ability to secure alternative counsel, and the possibility that the disqualification motion may be used by the prosecution for strategic purposes. Id. at 146. Although the moving party bears a high burden to show disqualification is warranted, Tessier, 731 F. Supp. at 729, the court should "resolve all doubts in

favor of disqualification." Franklin, 177 F. Supp. 2d at 464 (quoting United States v. Clarkson, 567 F.2d 270, 273, n.3 (4th Cir. 1977)).

The local rules of this court provide that "the ethical standards relating to the practice of law in criminal cases in this Court shall be the Virginia Rules of Professional Conduct, as published in the version effective January 1, 2000."  E.D. Va. Loc. Crim. R. 57.4(I).  The Virginia Rules of Professional Conduct ("Virginia Rules") follow the format of the American Bar Association Model Rules of Professional Conduct ("ABA Model Rules"), rather than the former American Bar Association Model Code of Professional Responsibility ("ABA Model Code"), or the former Virginia Code of Professional Responsibility ("Virginia Code").  See Va. R. of Prof. Conduct, Preamble.  The Virginia Rules further provide that, while not binding, other courts' interpretations of the ABA Model Rules are instructive in interpreting the Virginia Rules. See id.

### A.  Attorney Arnold Henderson

Rule 1.7 of the Virginia Rules provides, in pertinent part, that:

[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:

> (1) the representation of one client will be directly adverse to another client; or

> (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Va. Rules of Prof. Conduct 1.7(a).[1]

---

[1] Rule 1.7 permits representation notwithstanding a conflict of interest when the client consents to the representation.  Va. Rules of Prof. Conduct 1.7(b).  Such waivers are not controlling, however, when the trial court determines that an actual or potential conflict creates

Rule 1.7 emphasizes the duty of loyalty an attorney owes his client.  See Va. Rules of Prof. Conduct 1.7, cmt. 1.  Henderson owes such a duty to both his former client and his current client, Gordon.  Indeed, the Supreme Court has recognized that "special dangers" may arise when an attorney seeks to represent multiple criminal defendants charged in the same conspiracy.  Wheat, 486 U.S. at 159-60 (citing ABA Model Rule 1.7 (1984)).

Wheat involved a drug conspiracy defendant who sought to replace (substitute) his counsel with an attorney who had represented two other alleged members of the same conspiracy.  The United States objected to the proposed substitution on conflict of interest grounds, arguing that the possibility existed that the attorney's former clients would be called as government witnesses in the trial against the prospective client, and that the attorney's inability to cross-examine the former client witnesses would compromise his ability to effectively represent the prospective client.  The district court denied the motion to substitute counsel, notwithstanding waivers of conflict-free representation proffered by the attorney's former clients, as well as by the prospective client.  In affirming the district court's opinion, the Supreme Court noted the need for a defendant's attorney to vigorously cross-examine witnesses testifying against the client.  Wheat, 486 U.S. at 164; see also United States v. Provenzano, 620 F.2d 985, 1004 (3d. Cir. 1980).  The Court further noted the "ethical dilemma" the defendant's

---

an adverse interest between counsel and client.  See Wheat, 486 U.S. at 163 ("[W]e think the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."); see also Virginia Rules of Prof. Conduct 1.7, cmt.19 ("[W]hen a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent.")

attorney would face if forced to temper his defense of one client for the benefit of another.  Id.
Significantly, the Court held that such concerns arise not only when an actual conflict of interest
is demonstrated, but also when the potential for such a conflict exists.  Id. at 163.

Echoing the concerns in Wheat, the Eleventh Circuit affirmed the district court's
disqualification of a defendant's attorney in a context similar to this case.  United States v. Ross,
33 F.3d 1507, 1522-24 (11th Cir. 1994) (relying on Wheat, and disqualifying defense counsel
where the attorney's firm had previously represented another member of the subject conspiracy
who was a potential government witness against the attorney's present client who was awaiting
trial).  The Ross court cited the dual risks of counsel improperly disclosing privileged
communications occurring in conjunction with the representation of the former client in the
cross-examination of that former client who was testifying as a government witness, or the
potential for counsel to be deterred from sufficiently challenging his former client on cross-
examination.  33 F.3d at 1523; see also United States v. Vasquez, 995 F.2d 40, 42 (5th Cir.
1993).

Here, Henderson faces similar risks to his effective representation of Gordon.    The
United States contends that Henderson's former client's testimony will at least provide
information about the overall drug trafficking organization and conspiracy that will be critical to
the prosecution of Gordon and her co-defendants.  The possibility therefore exists that
Henderson, in his representation of Gordon, will be required to cross-examine his former client.
In such an instance, Henderson may at least inadvertently use information to benefit Gordon to
which he is privy only by virtue of his previous representation of his former client.  "The law
presumes that an attorney possesses all confidential information to which he had access in his

prior representation of a client . . . ."  In re Asbestos Cases, 514 F. Supp. at 920 (citations omitted).  At the same time, out of deference to his former client, Henderson may be seen as failing to cross-examine him adequately, which would be detrimental to Gordon's defense.  In either situation, Henderson's representation of Gordon would constitute a prohibited conflict of interest.

Furthermore, the Court is mindful of the potential for the sharing of information among co-defendant counsel in a multi-defendant case.  By virtue of his representation of his former client, Henderson may be privy to information which would directly benefit Dancy in his defense.  Given the obvious personal relationship between Gordon and Dancy, and the interplay of information relevant to their respective defenses, there is the distinct possibility that a cooperative defense may at least be inadvertently, or purposely developed between them, whereby privileged communications and/or information resulting from Henderson's representation of his former client would be disclosed and utilized to the benefit of Dancy's defense.

As an example of the risks involved, the Court asked Henderson at the hearing whether he could cross-examine his former client if the former client admitted further information about Gordon of which Henderson had not been currently aware.   Henderson responded that a conflict of interest would then exist and that he would be compelled to withdraw as Gordon's counsel.  The possibility that Henderson's former client, when called to testify, may provide information about Gordon even indirectly in regard to the overall conspiracy underscores the need for the Court to "exercise its own independent judgment as to whether the proceedings are likely to have the requisite integrity if a particular lawyer is allowed to represent a party."  Williams, 81 F.3d at

1324 (interpreting <u>Wheat</u>, 486 U.S. at 161-64).  Furthermore, preventive measures to preclude

such a possibility must be taken at this stage of proceedings before trial, rather than later when

disqualification would adversely impact Gordon even more.

Moreover, in the interest of judicial economy, the court must anticipate possible

consequences if Henderson is permitted to remain as counsel for Gordon.  In exchange for his

cooperation with the United States, Henderson's former client is seeking a reduction in his

sentence.  In the event that any sentence reduction is less substantial than he anticipated, he

could conclude that the result was because of Henderson's conflicted representation of Gordon

and the disclosure of confidential information gained from their association that was utilized for

Gordon's benefit and to the government's disadvantage, thus resulting in an ineffective

assistance of counsel challenge.  Yet another possible scenario is if Gordon feels Henderson's

cross-examination of his former client was too "mild" because of Henderson's perceived  loyalty

to his former client, in response to which she could also pursue an ineffective assistance of

counsel claim if she is convicted of the pending charges.  "If a district court agrees to the

multiple representation, and the advocacy of counsel is thereafter impaired as a result, the

defendant may well claim that he did not receive effective assistance."  <u>Wheat</u>, 486 U.S. at 161

(citing <u>Burger v. Kemp</u>, 483 U.S. 776, 795-96 (1987)).  "When counsel for a defendant in a

criminal case has an actual conflict of interest when representing the defendant and the conflict

adversely affects counsel's performance in the defense of the defendant, prejudice to the defense

is presumed and a new trial must be ordered."  <u>United States v. Tatum</u>, 943 F.2d 370, 375 (citing

<u>Cuyler v. Sullivan</u>, 446 U.S. 335, 348-50 (1980)).

In accordance with Fourth Circuit and Supreme Court precedent, the Court has balanced Gordon's right to counsel of her choosing against relevant ethical standards.  The balance tips in favor of disqualification where the Court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them" predominates.  Wheat, 486 U.S. at 160.  For the foregoing reasons, Henderson's continuing representation of Gordon constitutes a conflict of interest as precluded by Rule 1.7 of the Virginia Rules of Professional Conduct and relevant case precedent. Accordingly, the United States' motion to disqualify him will be GRANTED.

### B. Attorney Shannon Taylor

Rule 1.11 of the Virginia Rules provides that:

> [A] lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the private client and the appropriate government agency consent after consultation.[2]

Va. Rules of Prof. Conduct 1.11(b).

"The ethical considerations of attorneys who leave government service, and are hired by private firms, embrace not only protection of the interests of their clients, but also the interests of society and the integrity of government."  Rennie v. Hess Oil Virgin Islands Corp., 981 F. Supp. 374, 375 (D.V.I. 1997) (citing Cody, Michael W.J., Special Ethical Duties for Attorneys Who Hold Public Positions, 23 Mem. St. L. Rev. 453 (1993)).  "Courts are sensitive to the fact that a bright line rule screening all government attorneys from subsequent private practice will

---

[2] Here, there is no indication that Taylor's former employer, the Richmond Metropolitan Multi-Jurisdictional Grand Jury, has been consented to her representation of Defendant Dancy, and, in fact, government counsel has, without objection from Taylor, proffered otherwise.

adversely affect the government's ability to attract qualified attorneys; on the other hand there is the danger of government attorneys conducting their offices with an eye toward future private employment." Rennie, 981 F. Supp. at 375-76 (citing Lampert, A.M., Disqualification of Counsel: Adverse Interests and Revolving Doors, 81 Colum. L. Rev. 199 (1981)); see also United States v. Ostrer, 597 F.2d 337, 340 (2d Cir. 1979).

In determining whether Taylor's former official employment precludes her from representing Dancy in the current matter, the Court must ascertain the scope of Rule 1.11(b). The language of the Rule is substantially similar to its predecessor version, Disciplinary Rule 9-101(B) ("DR 9-101(B)"). Va. Rules of Prof. Conduct 1.11(b)- Va. Code Comparison. DR 9-101(B), in turn, was adopted from the former ABA Model Code, which contained several "canons." Among these, Canon 9 of the Rule provides that "[a] lawyer should avoid even the appearance of professional impropriety." Waters v. Kemp, 845 F.2d 260, 265 (11th Cir. 1988). The more current ABA Model Rules, however, do not include Canon 9, leaving the viability of the appearance of impropriety standard somewhat in doubt. Id. ("Under the Model Rules, the appearance of impropriety is not a ground for disqualifying a lawyer from representing a party to a lawsuit."); see also United States v. Washington, 797 F.2d 1461, 1466 (9th Cir. 1986); accord Bd. of Educ. of New York v. Nyquist, 590 F.2d 1241, 1247 (2d. Cir. 1979) ("[A]ppearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases.") Because the Virginia Rules are based on the ABA Model Rules (as opposed to the ABA Model Code), it appears that the mere appearance of impropriety is insufficient to warrant disqualification under Rule 1.11(b). Even so, recent case law from this Court suggests otherwise. See Franklin, 177 F. Supp. 2d at 464 (quoting Clarkson, 567 F.2d at 273, and noting

that district courts should weigh the circumstances of disqualification motions with view of preventing the appearance of impropriety).  The Court need not resolve the apparent conflict, however, because the circumstances surrounding Taylor's role as counsel to the local multi-jurisdictional grand jury demonstrate that she "participated personally and substantially" in her role with the grand jury so as to preclude her continuing representation of Dancy, even if the appearance of impropriety is an insufficient justification.

The Virginia Rules are silent as to the precise meaning of the phrase "participated personally and substantially," though "substantial" is defined as denoting ". . . material matter of clear and weighty importance."  Va. R. Prof. Conduct, Preamble.  A review of pertinent case law reveals that a determination of what constitutes "personal and substantial" participation requires consideration of the particular circumstances of the attorney's previous employment.  See Rennie, 981 F. Supp. at 376.  For example, the court in Dugar v. Bd. of Educ. of Chicago, Dist. 299, No. 92 C 1621, 1992 WL 142302, at *3-6 (N.D. Ill. June 18, 1992), disqualified a former school board member who sought, as private counsel, to represent students in a case against the Board involving a challenge to procedures implemented during her tenure on the Board. Specifically, the students in Dugar challenged the Board's suspension and expulsion policies. The court found that as a Board member, the attorney had been privy to the Board's consideration of the rationale underlying the Board's policies, including discussions regarding the Board's position as to the rights to be afforded students during expulsion proceedings, so as to disqualify the attorney from serving as counsel for students who were subject to the policy. Id. at *1-4.  The court specifically held that the attorney's involvement in the matter was "personal and substantial" in violation of Rule 1.11 of the Rules of Professional Conduct for the

-14-

Northern District of Illinois.[3]  Id. at *4-6.  Likewise, in United States v. Philip Morris, Inc., 312 F. Supp. 2d 27, 38-45 (D.D.C. 2004), the court disqualified a former Food and Drug Administration attorney from representing a tobacco company after the government offered unchallenged evidence indicating that the attorney had worked on related litigation.  Philip Morris, 312 F. Supp. 2d at 39-40.

Cases holding that a former government employee's involvement in a certain matter did not amount to "personal and substantial" participation include Franklin v. Clark, 454 F. Supp. 2d 356 (D.Md. 2006), in which a former Baltimore police officer challenged his dismissal under federal law and Maryland state law.  Clark, 454 F. Supp. 2d at 358.  The defendant police commissioner sought to disqualify the plaintiff's attorney, who, in his previous capacity as a city attorney, had worked on various employment matters for the Baltimore Police Department, including a memorandum regarding a local law that governed the police commissioner's ability to terminate a command-level employee.  Id. at 363.  In denying the defendant's motion to disqualify, the district court emphasized that disqualification determinations under Rule 1.11 should focus on the substance of an attorney's previous participation, as opposed to the "type" of involvement.  Id. at 366-67.  The court found that the attorney's subsequent representation did not "flow[] from the same core of facts" as the matters on which he worked while employed by the government, noting that he even left government service before the events giving rise to the Plaintiff's termination occurred.  Id. (quoting Richards v. Lewis, No. Civ.A.05-0069, 2005 WL 2645001, at *3 (D.V.I. Oct. 14, 2005)).  In Richards, a civil rights action, the court denied the

---

[3] The Rules of Professional Conduct for the Northern District of Illinois are consistent with Rule 1.11 of the ABA Model Rules.  Dugar, 1992 WL 142302 at *3.

defendant's motion to disqualify an attorney who, in her previous capacity as an assistant attorney general, merely signed a pleading on behalf of the government in a related unfair labor practice charge.  2005 WL 2645001 at *4.  The court held that the attorney's involvement was "pro forma," and did not rise to the level of "personal and substantial" participation contemplated by Rule 1.11 of the ABA Model Rules.  Id. at *3.  Other cases in which courts have found "personal and substantial" participation lacking include: Babineaux v. Foster, No. Civ.A. 04-1679, 2005 WL 711604, at *5-6 (E.D. La. Mar. 21, 2005) (evidence and testimony indicated that attorney's involvement as government employee was limited to being copied on two letters related to the matter); and Rennie, 981 F. Supp. at 376-77 (attorney's previous employment as commissioner of the department of labor included the authority to investigate employment discrimination complaints, but in the present case, her role was "in name only, with no actual participation therein.")

Virginia multi-jurisdictional grand juries are convened to investigate offenses related to activity associated with controlled substances and other crimes designated by statute.  Va. Code Ann. § 19.2-215.1.  Special Counsel to the grand jury is charged with preparing bills of indictment, and such counsel "may be present during the investigatory stage of a multi-jurisdiction grand jury proceeding and may examine any witness who is called to testify or produce evidence."  Va. Code Ann. § 19.2-215.6.

At the continued hearing, the United States represented to the Court that Taylor, in her prior capacity as counsel to the grand jury, approved numerous (88) subpoenas for Detective Dunn related to the grand jury's ongoing investigation of the same multi-faceted conspiracy that is a focus of the instant prosecution of Dancy.  Prior to the hearing, the Court conducted an *in*

*camera* hearing, with counsel present, during which Dunn confirmed that he had requested

Taylor's approval for the subpoenas, and that the subpoenas were related to the overall drug

conspiracy that is alleged to have involved Dancy.  Taylor has not disputed the government's

representation, but contends that her approval of the subpoenas did not vest her with knowledge

of the underlying investigation and, therefore, did not constitute "substantial" participation as

required to disqualify her from continuing representation of Dancy.  She described the subpoena

approval process as one that simply "flowed through her office."

Taylor's authorization, whether by her actual signature, or from a stamp used by her

secretary presumably with her authorization, demonstrates her personal involvement in the

matter.  Moreover, the fact that her authorization was necessary for Dunn to have conducted his

investigation of the conspiracy, or for her secretary to use the stamp, demonstrates her

"substantial" involvement.  The subpoenas permitted Dunn to gather such evidence as cell site

information, authorization for use of global positioning tracking devices, and the compelled

appearance of witnesses to provide testimony before the grand jury.   Unlike the attorneys in

Clark and Babineaux, Taylor's role as Dancy's attorney "flows from the same core of facts" as

her previous official service.  Her role as counsel to the local multi-jurisdictional grand jury was

not "pro forma;" rather, it was integral to Dunn's investigation into the overall conspiracy of

which Dancy is an alleged member.  To hold otherwise would minimize, if not trivialize, the

authority of subpoenas and the role of the counsel to an investigating grand jury, either local or

federal.  Accordingly, the Court finds that in her previous role as counsel to the grand jury,

Taylor "participated personally and substantially" such that her continued representation of

Dancy is precluded by the provisions of Rule 1.11(b) of the Virginia Rules.

### III.  Conclusion

Accordingly, for the above-mentioned reasons, the United States' motion to disqualify attorneys Henderson and Taylor (docket entry no. 12) will be GRANTED.

An appropriate Order shall issue.

_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge

Dated:  July 23, 2008
Richmond, Virginia